BENJAMIN EDWARDS AND LYNN OWENS, OWNERS OF "LIVE"; GEORGE BEAMAN, OWNER OF "CLUB 519", "5TH STREET DISTILLERY" AND "MAC BILLIARDS", PETITIONERS v. PITT COUNTY HEALTH DIRECTOR, JOHN H. MORROW, RESPONDENT

No. COA11-754

(Filed 20 March 2012)

**Constitutional Law—equal protection—smoking ban—private club exception—rational reason—no violation**

The trial court erroneously concluded that the challenged portions of the North Carolina smoking ban irrationally distinguished petitioners' establishments from country clubs and unconstitutionally subjected the establishments to restrictions while exempting country clubs. The legislature's exemption of country clubs is limited to private, non-profit country clubs and does not exclude public or for-profit country clubs. As the legislature could have had a plausible, rational reason for allowing smoking in private, non-profit country clubs, but disallowing smoking in private, for-profit non-country clubs, the smoking ban's private club exception did not irrationally classify the establishments, and respondent's enforcement of the North Carolina smoking ban against petitioners did not violate petitioners' constitutional right to equal protection.

Appeal by Respondent from order entered 17 November 2010 by Judge G. Galen Braddy in Pitt County District Court. Heard in the Court of Appeals 12 January 2012.

*Owens, Nelson, Owens & Dupree, PLLC, by Jonathan Vann Bridgers, for Petitioners.*

*Ferguson Stein Chambers Gresham & Sumter, PA, by Adam Stein, for Respondent.*

*Wyrick Robbins Yates & Ponton LLP, by K. Edward Greene and Tobias S. Hampson, for Amici American Heart Association, American Lung Association, American Cancer Society and American Cancer Society Action Network, Americans for Nonsmokers' Rights, Tobacco Control Legal Consortium, and Campaign for Tobacco-Free Kids.*

*Attorney General Roy Cooper, by Assistant Solicitor General John F. Maddrey, for Amicus State of North Carolina.*

STEPHENS, Judge.

**EDWARDS v. PITT CNTY. HEALTH DIR.**

[219 N.C. App. 452 (2012)]

In early 2010, the director of the Pitt County Health Department, Respondent John H. Morrow, sent notices of violation to Petitioners George Beaman, Benjamin Edwards, and Lynn Owens ("Petitioners"), the owners of Club 519, 5th Street Distillery, Mac Billiards, and Live (the "establishments"), citing the establishments' violation of North Carolina's smoking ban, N.C. Gen. Stat. § 130A-491, *et seq.*, and advising the owners that they would be subject to "an ongoing administrative penalty of $200 per day" if the violations continued beyond their third notice of violation. Petitioners appealed the citations and administrative penalties to the Pitt County Board of Health (the "Board of Health"), which upheld the penalties after hearing each appeal. Thereafter, Petitioners petitioned Pitt County District Court for judicial review of the decision of the Board of Health, contending, *inter alia*, that the Board of Health's enforcement of the North Carolina smoking ban—specifically enforcement of sections 130A-492(11) and 130A-496(b)(3), which Petitioners allege exempt all country clubs from the ban, but do not exempt the "similarly situated" establishments—violates Petitioners' constitutional rights to equal protection of the laws. Following a hearing in Pitt County District Court, the Honorable G. Galen Braddy presiding, the trial court entered an order in which it concluded that sections 130A-492(11) and 130A-496(b)(3), as applied to the Petitioners, "are in violation of the Equal Protection Clauses of both the United States and the North Carolina Constitutions and are therefore unconstitutional and unenforceable against Petitioners only." From this order, Respondent appeals, arguing that the trial court erroneously concluded that the challenged portions of the North Carolina smoking ban irrationally distinguish the establishments from country clubs and unconstitutionally subject the former to restrictions while exempting the latter. For the following reasons, we agree with Respondent.

While generally prohibiting smoking "in all enclosed areas of restaurants and bars," section 130A-496 of the smoking ban provides that "[s]moking may be permitted in . . . [a] private club." N.C. Gen. Stat. § 130A-496 (2011). Section 130A-492(11) defines a "private club" as follows:

> A country club or an organization that [(1)] maintains selective members, [(2)] is operated by the membership, [(3)] does not provide food or lodging for pay to anyone who is not a member or a member's guest, and [(4)] is either [(a)] incorporated as a nonprofit corporation in accordance with Chapter 55A of

the General Statutes or [(b)] is exempt from federal income tax under the Internal Revenue Code as defined in [section] 105-130.2(1). For the purposes of this Article, private club includes country club.

N.C. Gen. Stat. § 130A-492(11) (2011). Petitioners contend, and we agree, that the above statutory definition, read as a whole and interpreted to avoid superfluity,[1] creates two distinct types of private clubs that are exempt from the smoking ban: (1) country clubs, and (2) non-country club organizations meeting the four listed qualifications. The second sentence of the statutory definition, which specifically states that "private club includes country club," belies the argument advanced by Respondent that the four listed qualifications must be met by a country club before that country club can be considered a private club exempted from the smoking ban. Rather, the second sentence's unequivocal inclusion of country clubs in the private club exemption dictates the conclusion that, while a non-country club organization seeking exemption as a private club must meet the four listed qualifications, a country club need only be a country club in order to be exempted as a private club.

The question raised by Petitioners before the trial court, and the issue before this Court on appeal, is whether exempting country clubs from the smoking ban, but not the establishments, is unconstitutional.[2] Petitioners contend that this distinction is irrational, and thus, unconstitutional. *See Heritage Vill. Church & Missionary Fellowship, Inc. v. State*, 40 N.C. App. 429, 447-48, 253 S.E.2d 473, 484 (1979) (holding that statutory exemptions that make "an arbitrary and irrational distinction unrelated to the purposes of the statute" are "violative of the Equal Protection Clauses of the United States Constitution and of the North Carolina Constitution"), *aff'd*, 299 N.C. 399, 263 S.E.2d 726 (1980). They support this contention by highlighting the fact that, because section 130A-492(11) exempts all country clubs, for-profit country clubs are exempt while for-profit non-country club organizations are not. To address Petitioners' constitu-

---

1. *See State v. Coffey*, 336 N.C. 412, 417-18, 444 S.E.2d 431, 434 (1994) (citations omitted) (stating that (1) our courts construe each word of a statute to have meaning because it is always presumed that the legislature acted with care and deliberation, and (2) a statute should not be interpreted in a manner which would render any of its words superfluous).

2. We note that because no fundamental right or suspect classifications are at issue, Petitioners' argument is subject to rational basis review. *See Liebes v. Guilford Cnty. Dep't of Pub. Health*, ___ N.C. App. ___, ___, 713 S.E.2d 546, 549, *disc. review denied*, ___ N.C. ___, 718 S.E.2d 396 (2011).

tional claim, we must first determine whether a for-profit country club is, in fact, exempt from the smoking ban. Or, "When is a country club not a country club?"

Where statutory language is clear and unambiguous, our Courts do not "engage in judicial construction but must apply the statute to give effect to the plain and definite meaning of the language." *Fowler v. Valencourt*, 334 N.C. 345, 348, 435 S.E.2d 530, 532 (1993). "The plain meaning of words may be construed by reference to standard, nonlegal dictionaries." *State v. Webb*, 358 N.C. 92, 97, 591 S.E.2d 505, 511 (2004) (internal quotation marks omitted). In this case, however, dictionaries offer no clear, unambiguous definition of the term "country club." *See* Webster's Third New International Dictionary 521 (2002) (defining "country club" as "an upper-class suburban or outlying club or clubhouse for social life, golf, and other recreation"); The Random House Dictionary of the English Language 463 (2d ed. 1987) ("[A] club, usually in a suburban district, with a clubhouse and grounds, offering various social activities and generally having facilities for tennis, golf, swimming, etc."); The American Heritage Dictionary 463 (4th ed. 2000) ("A suburban club for social and sports activities, usually featuring a golf course"). Indeed, the dictionary entries seem to agree only that country clubs *usually* are suburban and feature social and recreational activities; any other characteristics are not universally applicable. We further note that (1) our General Statutes contain no definition of the term, and (2) the statutory codes of other jurisdictions, like the dictionary entries, are not in agreement as to what precisely constitutes a country club. *See, e.g.*, Fla. Stat. § 501.013(5) (2011) (for exemption from certain consumer protection requirements, a country club (1) must "ha[ve] as its primary function the provision of a social life and recreational amenities to its members, and for which a program of physical exercise is merely incidental to membership"; and (2) is defined as "a facility that offers its members a variety of services that may include, but need not be limited to, social activities; dining, banquet, catering, and lounge facilities; swimming; yachting; golf; tennis; card games such as bridge and canasta; and special programs for members' children"); Md. Code Ann., Alcoholic Beverages § 6-301(6)(iii) (2011) (for purpose of issuance of alcohol licenses, a "golf and country club" must have "200 or more bona fide members paying dues of not less than $75 per annum per member" and must "maintain[] . . . two or more tennis courts, a swimming pool at least 30 feet by 80 feet in size, and a regular or championship golf course of nine holes or more"). We con-

clude, therefore, that the undefined term "country club," as used in the statute, is ambiguous and unclear. As such, we must interpret that ambiguous statutory language "to give effect to the legislative intent" and avoid "[a] construction of [the] statute which operates to defeat or impair the object of the statute." *N.C. Baptist Hosps., Inc. v. Mitchell*, 323 N.C. 528, 532, 374 S.E.2d 844, 846 (1988) (citation omitted).

As specified in section 130A-491, titled "Legislative findings and intent":

> It is the intent of the General Assembly to protect the health of individuals in public places . . . from the risks related to secondhand smoke.

N.C. Gen. Stat. § 130A-491(b) (2011). The fact that the legislature's stated intent is to protect individuals in *public* places from the dangers of secondhand smoke, along with the fact that the language allowing smoking in country clubs is situated in the subsection defining *"private* club," is a clear indication that an interpretation of "country club" that "give[s] effect to the legislative intent" of the statutes would be one that only exempts private country clubs from the smoking ban. Conversely, an interpretation that allows smoking in public country clubs would, without question, "defeat or impair the object of the statute." Thus, we conclude that the legislature's exemption of country clubs from the smoking ban applies only to private country clubs and does not exclude public country clubs. The question, then, becomes, "When is a country club a private country club?"

As noted in this Court's recent decision in *Liebes*, courts have looked at various factors to determine when a club is private rather than public. ___ N.C. App. at ___, 713 S.E.2d at 555 (citing the "multifactor framework set forth in *United States v. Lansdowne Swim Club*, 713 F. Supp. 785 (E.D. Pa. 1989)" and various cases applying that analysis). Our legislature, too, considers several elements as determinative of private status and, indeed, has yet to settle on a single set of factors to make that determination, applicable in all instances. *See* N.C. Gen. Stat. § 18B-1000(5) (2011) (defining a "private club" as "[a]n establishment that is organized and operated solely for a social, recreational, patriotic, or fraternal purpose and that is not open to the general public, but is open only to the members of the organization and their bona fide guests"). *But see* N.C. Gen. Stat. § 130A-247(2) (2011) (" 'Private club' means an organization that maintains selective members, is operated by the membership, does not provide food or lodging for pay to anyone who is not a member or

a member's guest, and is either incorporated as a nonprofit corporation in accordance with Chapter 55A of the General Statutes or is exempt from federal income tax under the Internal Revenue Code as defined in [section] 105-130.2(1).". The foregoing authority, establishing that there is no bright-line rule for distinguishing private clubs from non-private clubs, indicates that there is, likewise, no clear answer to the question of when a country club is a private country club. Our task, then, in interpreting the legislature's ambiguous exemption of private country clubs from the smoking ban, is to answer that question in a way that best effectuates the legislature's intent and does not operate to impair the object of the statute. *See Willoughby v. Bd. of Trs. of Teachers' & State Emps. Ret. Sys.*, 121 N.C. App. 444, 449, 466 S.E.2d 285, 289 (1996) (construing statute "so as to best effectuate the stated [] goal" of the statute); *H.B.S. Contractors, Inc. v. Cumberland Cnty. Bd. of Educ.*, 122 N.C. App. 49, 55, 468 S.E.2d 517, 522 (1996) (pursuing the "paramount objective in statutory interpretation" of "giv[ing] effect to the legislative intent" by choosing the interpretation that "best effectuates the legislative intent"). To that end, and for the following reasons, we conclude that the legislature's exemption of private country clubs applies only to nonprofit country clubs and does not, as Petitioners suggest, exempt for-profit country clubs.

Initially, we note that the vast weight of authority uses nonprofit status as a factor weighing in favor of—or as a requisite for—a determination that a club is truly private. *See, e.g., Welsh v. Boy Scouts of America*, 993 F.2d 1267, 1277 (7th Cir. 1993) (holding that a club's nonprofit status supports the conclusion that the club is private); *Lansdowne Swim Club*, 713 F. Supp. at 804 (holding that a club's nonprofit status "support[s] its claim that it is a private club"); N.C. Gen. Stat. § 130A-247(2) (private club must be nonprofit).

Beyond regularly serving as a requisite for private status in legal analysis, nonprofit status, in and of itself, presumptively ensures that a country club is truly, rather than nominally, a private club. From an economics standpoint, it is considered a given that the primary aim of a for-profit entity is profit maximization. *See, e.g.,* James F. McDonough III, Comment, *The Myth of the Patent Troll: An Alternative View of the Function of Patent Dealers in an Idea Economy*, 56 Emory L.J. 189, 208 (2006) (noting that "the overriding motive of a for-profit firm is to maximize profits" (citing R.H. Coase, *The Nature of the Firm*, 4 Economica 386, 390-92 (1937))); Srikanth Srinivasan, Note, *College Financial Aid and Antitrust: Applying the*

*Sherman Act to Collaberative Nonprofit Activity,* 46 Stan. L. Rev. 919, 932 (1994) ("Microeconomic theory assumes that commercial firms pursue one objective—profit-maximization." (citing Robert S. Pindyck & Daniel L. Rubinfeld, *Microeconomics* 4 (2d ed. 1992))). In pursuit of that goal, a for-profit country club's owners will make decisions for the club—such as the requirements for membership, the size of membership, whether to allow a new member, and whether to allow smoking—based primarily, if not singularly, on which option maximizes the country club's profit. *Cf.* Nina J. Crimm, *An Explanation of the Federal Income Tax Exemption for Charitable Organizations: A Theory of Risk Compensation,* 50 Fla. L. Rev. 419, 446-47 (1998) ("In the for-profit setting, the shareholders' primary concern is to maximize their profits and, because the board and management are accountable to the shareholders, a major objective is to satisfy the shareholders' goal. This pressure will theoretically cause decision-makers of for-profit entities to attempt to maximize profits . . . ."). The necessary results of such profit-driven decision-making will be minimal membership requirements (a non-exclusionary membership fee), expanded membership (open to anyone willing to pay the fee), and, ultimately, a near-publicly accessible country club (at least for anyone who can afford the fee). Contrasted with a nonprofit private country club—whose ownership and membership decisions are not based on profit maximization,[3] but rather on furtherance of the private social and recreational purposes for which the club was established—the for-profit club is far less likely to exhibit those characteristics associated with truly private organizations, *i.e.,* more selective membership and operation by members for membership rather than by owner for profit. Accordingly, an interpretation of "country club" that allows smoking in only those truly private, nonprofit country clubs and that bans smoking in quasi-public, for-profit country clubs best effectuates the legislature's intent to protect the health of individuals in public places.

Further, as evidenced by the legislature's creation of a private club exception in the first place, it is clear that the legislature, while attempting to protect individuals in public places, also sought to limit the impact of the smoking ban on the rights of association of members of organizations that are truly private. *Cf. Coastal Ready-Mix*

3. *See* Barak D. Richman, *Antitrust and NonProfit Hospital Mergers: A Return to Basics,* 156 U. Pa. L. Rev. 121, 130 n34 (2007) (cautioning against presuming that profit maximization "drives nonprofit behavior"); Srinivasan, 46 Stan. L. Rev. at 932 (noting that "nonprofits do not presumptively pursue profit-maximization over noncommercial goals").

*Concrete Co. v. Bd. of Comm'rs of Town of Nags Head*, 299 N.C. 620, 629, 265 S.E.2d 379, 385 (1980) (holding that legislative intent may be shown by "the language of the statute or ordinance" and "what the act seeks to accomplish"). In our view, interpreting the country club exemption to apply only to nonprofit private country clubs effectuates this intent by allowing smoking in clubs that are established and operated in the furtherance of a private, social or recreational purpose, while protecting from the risks of secondhand smoke citizens patronizing those organizations that are nominally private, but allow nearly unrestricted public access.

It is also notable that the legislative history of the statute reveals that the legislature's initial definition of "private club" in the proposed bill was nearly identical to the definition of private club in section 18B-1000(5), the main difference being an additional nonprofit requirement not found in section 18B-1000(5). *See* Act of May 19, 2009, ch. 27, 2009 N.C. Sess. Laws 39 (private club exception first introduced in the fourth edition of House Bill 2); *see also* N.C. Gen. Stat. § 18B-1000(5). We find it significant that, presented with two differing statutory definitions of "private club"—one definition with a nonprofit requirement, one without, *compare* N.C. Gen. Stat. § 18B-1000(5), *with* N.C. Gen. Stat. § 130A-247(2)—and cognizant of those differing definitions, *Williams v. Alexander Cnty. Bd. of Educ.*, 128 N.C. App. 599, 603, 495 S.E.2d 406, 408 (1998) ("In ascertaining the intent of the legislature, the presumption is that it acted with full knowledge of prior and existing laws."), the legislature chose to model the statutory definition in the smoking ban after the private club definition that did not contain a nonprofit requirement, yet added to that definition a requirement that the club must be nonprofit. Clearly, then, the drafters of the smoking ban's private club exception intended that all clubs qualifying under that exception would be nonprofit clubs. Accordingly, we conclude that an interpretation that accomplishes just that result best effectuates the legislature's intent, as shown by the wording and legislative history of the statute.

Because we conclude that only private, nonprofit country clubs are exempt under the private club exemption, to address Petitioners' constitutional claim we need not determine the constitutionality of exempting for-profit country clubs and not for-profit non-country club organizations. Rather, we need only determine the constitutionality of the smoking ban's exemption of private, nonprofit country clubs, but not the establishments.

Assuming that the establishments, which are private and for-profit, are similarly situated with private, nonprofit country clubs with respect to the smoking ban's statutory scheme, the question is whether the legislature could have had a plausible, rational reason for allowing smoking in private, nonprofit country clubs, but disallowing smoking in private, for-profit noncountry clubs. *Rhyne v. K-Mart Corp.*, 358 N.C. 160, 180-81, 594 S.E.2d 1, 15 (2004) (holding that rational basis review is satisfied "so long as there is a plausible policy reason for the classification . . . and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational") (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 11, 120 L. Ed. 2d 1, 13 (1992)). And the answer, as it was in *Liebes*, is "yes." ___ N.C. App. at ___, 713 S.E.2d at 553-55. In *Liebes*, this Court noted several plausible reasons why our legislature would exempt nonprofit non-country club organizations, but not for-profit non-country club organizations, such as the potential impairment of the legislative intent accompanying a broader definition of "private club" and more objective enforcement resulting from the ready discernibility of nonprofit status. *Id.* Those same reasons justify the legislature's exemption of only nonprofit country clubs and not for-profit non-country club organizations such as the establishments. Accordingly, we conclude that the smoking ban's private club exception does not irrationally classify the establishments, and that the Board of Health's enforcement of the North Carolina smoking ban against Petitioners does not violate Petitioners' constitutional right to equal protection. Therefore, we hold that the trial court erred in declaring the challenged section of the North Carolina smoking ban unconstitutional. The decision of the trial court is

REVERSED.

Judge STROUD concurs.

Judge BEASLEY concurs in separate opinion.

BEASLEY, Judge, concurring in separate opinion.

I agree with the majority's reliance on *Liebes v. Guilford Cnty. Dep't of Pub. Health,*____ N.C. App.____ 713 S.E.2d 546 (2011) to resolve this issue, but I believe that the majority's interpretation of the country club exemption unduly narrows the force and effect of the statute.

"Where a statute contains two clauses which prescribe its applicability, and the clauses are connected by a disjunctive (e.g. "or"), the

EDWARDS v. PITT CNTY. HEALTH DIR.

[219 N.C. App. 452 (2012)]

application of the statute is not limited to cases falling within both clauses, but will apply to cases falling within either of them." *Spruill v. Lake Phelps Vol. Fire Dep't, Inc.*, 351 N.C. 318, 323, 523 S.E.2d 672, 676 (2000) (internal quotation marks and citations omitted). Moreover, "we follow the maxims of statutory construction that words of a statute are not to be deemed *useless or redundant*[.]" *Town of Pine Knoll Shores v. Evans*, 331 N.C. 361, 366, 416 S.E.2d 4, 7 (1992).

N.C. Gen. Stat. § 130A-492(11) (2011) states,

> A country club or an organization that maintains selective members, is operated by the membership, does not provide food or lodging for pay to anyone who is not a member or a member's guest, and is either incorporated as a nonprofit corporation in accordance with Chapter 55A of the General Statutes or is exempt from federal income tax under the Internal Revenue Code as defined in G.S. 105-130.2(1). For the purposes of this Article, private club includes country club. (emphasis added).

The majority opines that the "country club" exemption only applies to "nonprofit country clubs and does not . . . exempt for-profit country clubs." Under the majority's interpretation, the "country club" and "an organization" are nearly identical. I do not believe that the legislature intended to limit the "country club" exception to non-profit country clubs, especially where juxtaposed to the term "country club", the legislature made another exception for non-profit organizations. Here, the legislature could not have intended to use this disjunctive if both categories had the same characteristics. The majority's approach to applying the "country club" exception creates a redundancy and unnecessarily limits the reach of the statute.